**IRVIN v. BROWN PAPER MILLS CO., Inc.**
**Civil Action No. L. R. No. 423.**

District Court, E. D. Arkansas, W. D.
Oct. 8, 1943.

Lee Cazort, Jr., of Little Rock, Ark., and John Baxter and Will J. Irvin, both of Dermott, Ark., for plaintiff.

Bridges, Bridges & Young, of Pine Bluff, Ark., Clyde R. Brown, of Monroe, La., and L. J. Beckenstein, of Beaumont, Tex., for defendant.

TRIMBLE, District Judge.

The plaintiff, Robert H. Irvin, was a licensed real estate dealer in the town of Sheridan, Grant County, Arkansas, and was a citizen of that state. The defendant Brown Paper Mill Company, a Delaware corporation, is the operator of a paper mill at Monroe, Louisiana, and was purchasing and holding lands for the growing and production of pulp wood in the states of Louisiana and Arkansas. This suit was brought in the Circuit Court of Grant County, Arkansas, seeking to recover a judgment for some thirteen thousand dollars, on an alleged real estate brokerage contract, and was removed here by the defendant upon the ground of diversity of citizenship. The Court has jurisdiction of both the parties and the cause of action.

In December, 1941, this cause was tried to the Court without a jury. Testimony was taken ore tenus at the bar of the Court and depositions were introduced. At the conclusion of the trial counsel argued the cause orally and submitted briefs. After consideration of the briefs the Court wrote a short memorandum of its proposed findings. In this memorandum the Court directed counsel for plaintiff, in whose favor it found, to prepare findings of fact and conclusions of law, submit to counsel for defendant and then present to the Court. At the time the proposed findings of fact and conclusions of law were presented to the Court with a praecipe for judgment, the Court heard arguments of counsel and adopted the proposed findings of fact and conclusions of law presented by counsel for plaintiff, and entered judgment for the plaintiff in the amount prayed. This judgment was appealed by the defendant and the judgment set aside by the court of appeals, and remanded with directions. It is now here for action pursuant to this remand.

Prior to the purported making of the contract on which this suit is based, the plaintiff had optioned a large tract of land from the Chicago Land and Timber Company, and had, in effect, sold his option to the defendant. In the pleadings, briefs, arguments and testimony on behalf of plaintiff, his profit in this deal is spoken of as a "commission", but it in fact was a profit, being the difference between the option price to the plaintiff and the purchase price paid by the defendant. (Ms. Tr. p. 36) In this transaction as between the parties here, there were none of the elements of principal and agent, or owner and broker. This transaction was closed, the final papers executed, defendant took such title as it contracted for, and paid to the plaintiff, as a matter of accommodation to him, his profit in this transaction apart from the payment to the owner of the land. (Ms. Tr. p. 3 and plaintiff's deposition) This was in the late summer or early fall of 1937.

As alleged by the plaintiff, his contract with the defendant was "that upon all occasions when he located timber and brought the defendant in contact with the owners of the land and timber and if the land and timber were purchased that he would be entitled to and would receive a commission of twenty-five cents per acre." In his oral testimony, he fixed the time of making this alleged contract as at the time of the closing of the Chicago Land and Timber Company deal, in the Pines Hotel, at Pine Bluff, Arkansas. He testified that he entered into an oral agency or brokerage contract with the defendant through its general superintendent, M. C. McDonald, and woods foreman, C. E. Wilds. The plaintiff contends, and so testified, that this contract was to cover all tracts of timber lands, both large

and small. This is the first time any element of agency entered into the relationship of the parties. Mr. McDonald and Mr. Wilds testified that they did authorize the plaintiff to find and report to them small tracts of timber land which would block into the large tract they had just bought; that there were many small tracts scattered throughout and within the large tract which they desired to purchase and include in their holdings, as it was more economical to handle a solid and larger block of land than a smaller one consisting of scattered tracts. It is their contention that these are the tracts of land for which the agency of the plaintiff was established.

J. L. Williams and Sons, Inc., was the owner of a large tract of land comprising 53,363.27 acres lying in Grant, Dallas, Hot Spring, Saline and Jefferson Counties, Arkansas, which it sold to the defendant Brown Paper Mill Company, Inc., and the plaintiff alleges that he was the procuring cause of this sale as agent for the defendant. In paragraph ten of his complaint, he alleges that he had a definite oral agreement to be paid the commission of twenty-five cents per acre on this tract when purchased and that "during the progress of said negotiation it was agreed by the agents of defendant herein that if the sale was consummated that plaintiff would be paid twenty-five cents per acre for all lands purchased." However, when a witness in his own behalf, he denied any specific, oral agreement to pay this commission on the Williams tract. In fact, he stated positively that no specific contract was made, and, further, that none was necessary.

The plaintiff relies entirely for recovery upon the contract alleged in his complaint and to which he testified.

Defendant contends that the plaintiff has not stated a claim against the defendant upon which he can recover; denies that there was an agreement to pay the plaintiff any commission at all upon the purchase of the land from J. L. Williams and Sons, Inc. Its further defense is that if there was a contract to pay a commission upon the J. L. Williams and Sons, Inc., tract, or upon any large tracts of land, made by C. E. Wilds, that such agent or employee was without authority, real or apparent, to make a binding contract such as is alleged and relied upon by the plaintiff.

Furthermore, defendant contends that even if it be held that the agency of the plaintiff included any large tracts of land,

such as the J. L. Williams and Sons, Inc., tract, this agency was cancelled by the letter of April 6, 1938, written for the defendant by Mr. Wilds, who plaintiff alleges made the original contract with him. It is also contended by defendant there is not in this record one scintilla of evidence to show that after this cancellation the contract was reinstated, or that any contract was ever made thereafter whereby the defendant was to pay the plaintiff a commission of twenty-five cents an acre on large tracts of land, and especially that purchased from J. L. Williams and Sons, Inc., for which plaintiff seeks recovery.

Plaintiff, in his testimony before the Court (Ms. Tr. pages 40 to 42) and in his deposition, admitted the receipt of this letter.

Plaintiff's counsel filed proposed findings of fact and conclusions of law which the Court adopted. In proposed finding No. 6, he requested the Court to hold, "On April 7, 1938, Irvin's authority to purchase land was cancelled; * * *", and this finding was made by the Court. It is now the contention of the plaintiff that this finding of fact was erroneous; that the effect of the letter of April 7 (6), 1938 (Exhibit 22), was not to cancel the contract but to stay a portion of it, that is, the purchase of large tracts of land. He further contends that even if this was the effect of that letter and the intention of the defendant, the conduct of both the defendant and plaintiff was such that this stay was never put into effect but the contract was treated by the parties as being still in force, and that they proceeded under it.

The burden of proof in this case rests upon the plaintiff to establish the material issues by a fair preponderance of the evidence, and the defendant has no burden to sustain, nor need it produce any evidence at all until by competent evidence the plaintiff has established that he had a contract, the terms of it, the authority of defendant's alleged agent or agents to enter into the contract for the defendant, the performance of the contract by the plaintiff according to its terms, and the relief to which he is entitled. It is axiomatic that the Court cannot make a contract for the parties but can only construe and enforce the contract which they have made; and if there was no meeting of the minds, there is and can be no contract. Corey v. Mercantile Insurance Co. of America, Ark., 169 S.W.2d 655, decided March 22, 1943.

The making and existence of a contract constituting the plaintiff agent or broker for the defendant in the purchase of land, the rate of pay and the time of its making not being in dispute, the first question that presents itself for consideration is the extent of that agency. Here the oral testimony of the plaintiff, as a witness in his own behalf, and that of M. C. McDonald, general superintendent, and C. E. Wilds, woods foreman for the defendant, are in conflict, they being the only persons present at the time of the making of the contract.

The plaintiff, as stated, testified that it covered any and all sizes of tracts of land and the eye-witnesses for the defendant testified just as positively that it covered only small tracts blocking in with the Chicago Land and Timber Company tract.

■ This being the situation, the Court must go to the conduct of the parties and see how they treated the contract and what they did thereafter or in pursuance thereof. This contract was made approximately in August or September, 1937. On September 4, 1937 (Exhibit No. 25), the defendant wrote a letter to the plaintiff, signed by C. E. Wilds, which throws considerable light on the question of the contract. That letter read: "Mr. Butler submitted the plats and options on approximately 59,420 acres you phoned the writer about a few days ago. We will consider the purchase of these lands provided a better deal can be worked out relative to the mineral rights. We will not consider the proposition at all unless we can acquire all the mineral rights less one sixteenth. In other words, the deal will have to be approximately the same as the Chicago Land and Timber Company's deal just completed. We are writing you today so that you may take this question up with the owners immediately and upon receiving word from you we will get busy and check the acreage." Almost upon the heels of the contract, this plaintiff is found submitting to the defendant for its consideration an acreage of land greater than that purchased from the Williams Company involved herein, and which the defendant was considering. Again we find in Exhibits Nos. 26 and 27, the plaintiff writing to the defendant on September 6 and October 2, 1937, submitting for defendant's consideration other large tracts in which the plaintiff shows that he was negotiating for the benefit of the defendant. In the letter of September 6, 1937, we find him saying: "I will say this, that they want to sell the land, as you will note that I have gotten them down on the price from $5.00 to $3.00 and $2.25 per acre, which is very low and I believe that WE can work the other matters out with them to the end that WE can make the deal. If you could come up here this week, I would like for us to run over to Arkadelphia and by you talking to them, it would look a little more like a trade, and I am sure that WE could work out something with them that would be satisfactory to all concerned. You know that all I can do is to locate the lands and get the price, and you can make the trades as you and your Company sees fit, and that's satisfaction to all concerned." A reading of this letter, especially the last sentence quoted, would and should leave no one in doubt but that the plaintiff was negotiating for the benefit of the defendant, and securing as low a price as possible. If he represented the owner wishing to sell, he was certainly working against the best interest of his principal, and would, naturally, have been telling the defendant here why the land was worth $5 an acre instead of seeking to beat the price down.

Again on November 9, 1937, Exhibit No. 28, the plaintiff wrote a letter to the defendant in which he submitted for consideration certain lands comprising some 10,000 acres, in which he advises them the price quoted is rock bottom and that in order to push the trade through he expects to pay Mr. Anderson (agent for seller) a portion of his commission. He says: "I am taking care of Mr. Anderson out of my commission of twenty-five cents per acre, and he is to receive nothing further, either from you or the owners. I am sacrificing part of my interest to help you make the deal, if you want the land."

Then came Exhibit 22, which was written by C. E. Wilds to the plaintiff on April 6, 1938, and which will be quoted in full: "When the writer returned to the office last Friday, Mr. Brown was here. After discussing various timber deals in detail with him and Mr. McDonald, the conclusions were reached that the Long Bell Deal, as well as others, should be held up indefinitely. You may proceed, as before, in buying small tracts of land that block in with our Chicago purchase."

It is the contention of the defendant that conceding for the purpose of argument only that there was a contract with the plaintiff

for the purchase of large tracts of land that this letter cancelled the contract and that it was never renewed or reinstated. However, the question of cancellation will be reserved for a later discussion. This letter is pertinent in that it brings home to the defendant and Mr. Brown, its President, full knowledge that the plaintiff was submitting to it large tracts of land for its consideration.

In Exhibit No. 30, being letter dated April 21, 1938, written about two weeks after the letter of April 6, 1938, we find the plaintiff writing to the defendant: "Mr. Butler (defendant's forester) advised me that you wanted to go ahead with the deal with J. L. Williams & Sons, please advise me if this is right, and I will get the matter started up again. I believe WE can make this deal."

Then again on April 29, 1938, plaintiff wrote the defendant, in Exhibit 31: "I have not heard from you relative to the deal we had on with J. L. Williams & Sons. Would like to have you advise me, if you wish me to go ahead with the deal, just at this time. I do not care to say anything more to them about it, unless you are sure that you can go through with it, in the event we get up to that point. Naturally that would be useless and might hinder us later, should we want to go through with the deal."

Again on January 22, 1939, January 26, 1939, January 30, 1939, June 18, 1939, May 10, 1940, we find plaintiff writing defendant about the Williams & Sons tract, and from then on until the deal was closed the plaintiff was in correspondence with the defendant about this proposed purchase.

As the negotiations between the defendant and the representatives of J. L. Williams & Sons, Inc., began to shape up, there occurred several circumstances which throw further light on the issues here.

While the representatives of the defendant and the J. L. Williams & Sons, Inc., were working out the final details, and drawing up the final papers, the plaintiff called Mr. Lee Williams, and asked him what they were doing about his commission, and informed Mr. Williams that it was all right for them to add his commission on to the purchase price and J. L. Williams & Sons, Inc., pay it over to him, but that was a matter between J. L. Williams & Sons, Inc., and the defendant. In other words, the plaintiff was willing to cooper-

ate in any way so long as he got his commission. Furthermore, it appears from this and all the other evidence in the case that the plaintiff realized he was going to have trouble with the defendant about the commission and was trying to prevent the necessity of bringing the lawsuit that he finally did bring. Mr. McDonald says that he had investigated and decided that the plaintiff was not entitled to any commission. He did not specify what investigation he made in detail, but admitted that in his investigation he never contacted the plaintiff in an endeavor to find out his position and the grounds upon which he based his claim. Counsel for defendant criticize the plaintiff for calling Mr. Lee Williams instead of some officer, attorney, agent or employee of the defendant, but that has no special significance in the case. He called him still hoping that his commission could be added to the purchase price, paid to him by J. L. Williams & Sons, Inc., and save litigation. When plaintiff at that time inquired of Mr. Lee Williams he was told, by Mr. Williams: "We are going to handle it, Bob, we are coming to it now." Mr. Lee Williams also testified that at that conference defendant brought up the subject of plaintiff's commission, and it was there discussed.

Mr. Lee Williams corroborates the plaintiff's testimony that C. E. Wilds requested Mr. Williams to add on to the purchase price a sufficient sum to pay plaintiff his commission. However, he further testifies that the plaintiff said he was probably going to have trouble with the Brown Paper Mills Company, in which he proved himself a good prophet, and offered to pay Mr. Lee Williams a part of his commission to help him collect it by adding it on to the purchase price. Mr. Williams submitted the proposition to the board, and Mr. J. L. Williams, Sr., the president, immediately turned it down.

While Mr. Wilds denied that he made this request, the Court is convinced that he did. Mr. Wilds knew the defendant was seeking a way to avoid the payment to the plaintiff the commission which he had earned, and knowing that plaintiff was entitled to be paid, he sought by this subterfuge to secure for the plaintiff the payment to which he was rightfully entitled. It is understandable why he would deny making the request, but the Court does not believe his denial is entitled to any weight. This circumstance is in line with the conversa-

48

tion at the filling station testified to by Mr. Wilds and Mr. Butler, also the plaintiff. Mr. Wilds approached the plaintiff for a settlement, so the plaintiff testified and so the Court finds, and tried to get the plaintiff to settle for a less sum of money than he was entitled to under the contract. This is clearly a recognition by Mr. Wilds that the plaintiff had a contract, that he had complied with that contract, that he was the procuring cause of this purchase, and that he was entitled to be paid.

Mr. G. G. Williams, general superintendent for the J. L. Williams & Sons, Inc., testified that when the officers and representatives of the defendant were making a tour of inspection of the lands which were finally purchased: "They wanted to look around over the land, and the roads were not any too good, and I think I took Mr. Wilds in my car and maybe Lee took the other two fellows with them, and we drove them around over our holdings, and in walking through the woods, I don't remember which one Mr. McDonald or Mr. Wilds, one, I had my mind on five dollars an acre net, and I didn't know, it was brought up, I really objected all the way through to selling the land for five dollars an acre because I thought it was worth more, anyway, and we were walking through a mighty nice piece of timber, and I said something about that, he bought it too cheap, and if there was any commission to be paid out of it, it wasn't to come out of our part of it, that it was my understanding we were to get five dollars an acre net, and that's all I know, I don't know which one—whichever it was said, 'That will be taken care of,' except they all was about there, and I stopped objecting to the sale, and I was the only one objecting to selling the land for that price." (P. 103, Ms. Tr.)

Mr. Wilds and Mr. McDonald were both witnesses in this case, and Mr. Wilds was asked about this conversation and he denied that any such conversation was had with him. Mr. McDonald while a witness was not asked about it and never did deny such a conversation.

It also appears from the testimony of the witnesses, both on behalf of the plaintiff and the defendant, that the plaintiff submitted to the defendant large tracts of land, that the agents of the defendant thereupon would come to Sheridan at his suggestion, and would make an inspection of the acreage with the plaintiff, would secure prices from the owners, and negotiate for the purchase of the land. It also appears on these trips that the defendant, through its agents and employees, paid the expenses of the trips, not only of themselves, but of the plaintiff, including travel and subsistence. There is no evidence they paid plaintiff anything for his time.

■ The Court finds that the contract made by the plaintiff with Mr. McDonald, whose authority to make such a contract is fully sustained, and in the presence at least of Mr. Wilds, on behalf of the defendant, was for any and all acreages which the plaintiff might submit and which the defendant might find acceptable and might purchase, and that if, as and when these lands were purchased, the plaintiff was then, under the terms of that contract, entitled to receive compensation for his services at twenty-five cents per acre.

What was the effect of the letter of April 6, 1938, Exhibit No. 22?

■ As the Court of Appeals in its opinion, 8 Cir., 134 F.2d 337, suggests, this question was not fully presented to the Court when this case was first here. A careful reading of that letter shows that it was in no sense a cancellation of any existing contract. The words relied on to show a cancellation are: "the conclusion was reached that the Long Bell Deal, as well as others, should be held up indefinitely." There is a vast distinction between cancellation and holding up indefinitely, which might well mean until further notice. Furthermore, even this holding up indefinitely was not put into effect, and both the plaintiff and defendant went ahead with the J. L. Williams & Sons, Inc., deal until consummation. In cases of doubt as to the meaning of terms used by the parties, or their intention, where there is a conflict in the testimony, the best evidence of the meaning is what the parties did. Applying that rule here, we find both parties disregarding this direction to hold up indefinitely and proceeding with the negotiations.

■ The last paragraph of this letter reads as follows: "You may proceed, as before, in buying small tracts of land that block in with our Chicago purchase." This means no more than that it was not the intention of the defendant to hold up indefinitely, or otherwise, the purchase of small tracts, such as they had bought, but only the large tracts.

Hence, the Court is now of the opinion that this letter of April 6, 1938, Exhibit No.

22, was not a cancellation of the then existing contract, but, in reality, was first an evidence of its making and existence, and, second, a direction to hold up indefinitely, or until further advised, a portion of it, which direction was not carried into effect by either party.

The Court of Appeals has propounded the question: "Was Irvin the procuring cause of the contract of purchase?" The answer is in the affirmative.

The plaintiff himself testified that he took the matter up with the defendant's agent, C. E. Wilds, and that he took Mr. Wilds to the home of Mr. Lee Williams and there introduced the subject as between them, and thereafter he discussed the matter with both Mr. Lee Williams and the defendant's agents, and there also appears in the record numerous letters written by the plaintiff to the defendant, and by the defendant to the plaintiff about this deal. Furthermore, Mr. Lee Williams testified that the plaintiff was the one who initiated the transaction and negotiations which eventuated in the sale of this land to the defendant, and that it was his understanding at all times that plaintiff was representing the defendant and he treated with him as such, and when he wanted to communicate with the defendant he took it up with the plaintiff.

It is true that the plaintiff did not sit in on the final negotiations, and did not participate in working out the details of the final contract entered into, but this is of little significance. He was not a lawyer, a lumberman, nor a woodsman, he was a dealer in oil products and was only incidentally engaged in the real estate business, so that he would have been of little help in working out these details. However, if he had written but one letter, or made but one telephone call, or had but one conversation, which initiated the transaction and aided in its consummation in a purchase by the defendant of the lands in controversy, on terms and at prices acceptable to it, he would have performed his duty under his contract and would have been entitled to be paid his commission. Without the intervention of the plaintiff here there is no showing that this purchase and sale would have ever taken place, therefore, he was the procuring cause of the purchase by the defendant of the lands in suit.

The Court is of the opinion that the plaintiff had a valid and subsisting contract with the defendant, which was in full force and effect on or about November 14, 1940, at the time the contract of purchase was entered into between the defendant and the J. L. Williams & Sons, Inc., for the purchase of the lands for which plaintiff seeks to recover a commission.

The sole remaining question is when did the payment of this commission become due, or, if not now due, when will the payment of the commission become due?

The plaintiff testified, and it is not disputed, that when lands were accepted by the defendant and the contract entered into, his commission was then due and he was paid. It is true that he did considerable curative work upon the title to many of the small tracts, but he testified that this was not a part of his duty under his contract, but that he did it for the accommodation of the defendant, the defendant having no agent resident in Grant County, Arkansas, to do that work. That testimony also stands uncontradicted.

Under the contract between the defendant and the J. L. Williams & Sons, Inc., there is a series of provisions, by which the defendant is to pay for the lands as they are cutover and delivered, and the title at the time is found satisfactory, but on a further reading of this contract, and taking the same as a whole, it is the purchase presently of 53,363.27 acres of land for future delivery and payment. Paragraph III of said contract provides: "It is expressly understood and agreed that the actual conveyance, sale and delivery of said lands shall not be deemed to have taken place until the execution and delivery by SELLER of sufficient deed or deeds conveying said lands to BUYER, and BUYER shall have made payment of the price therefor, but the obligations of the SELLER herein shall be covenants running with the lands."

Not only did the seller's obligations under this contract become covenants running with the lands, but the further terms of the contract are such that the defendant can require the J. L. Williams & Sons, Inc., to deliver every acre of the land, whether cut over or not. See subsections (d) and (e) of section 1 of Exhibit A to complaint.

The Court is of the opinion that when this contract was entered into between the defendant, as purchaser, and the J. L. Williams & Sons, Inc., and that contract put of record, and "the obligations of the seller

herein" became "covenants running with the lands", the plaintiff had complied fully with his contract and was entitled to be paid for his services.

The plaintiff is entitled to judgment for twenty-five cents an acre on 53,363.27 acres, together with his costs.

Findings of fact and conclusions of law and praecipe of judgment carrying into effect the findings in this memorandum have been prepared and entered of record.